**Myzafer JAUPAJ, Petitioner,**

v.

**Alberto R. GONZALES, United States Attorney General,\* Respondent.**

No. 03–40667.

United States Court of Appeals, Second Circuit.

June 15, 2005.

---

\* Pursuant to Federal Rule of Appellate Procedure 43(c)(2), Attorney General Alberto R. Gonzales is automatically substituted for former Attorney General John Ashcroft as the respondent in this case.

Myzafer Jaupaj, Astoria, NY, for Petitioner pro se.

Robin E. Feder, Assistant United States Attorney, District of Rhode Island (Robert Clark Corrente, United States Attorney, on the brief) Providence, RI, for Respondent.

PRESENT: MCLAUGHLIN, STRAUB, and HALL, Circuit Judges.

## SUMMARY ORDER

Petitioner Myzafer Jaupaj ("Jaupaj"), a native and citizen of Albania, entered the United States without permission in March 2001. Jaupaj was quickly identified by the Immigration and Naturalization Service and, in November 2001, was charged with removal. Jaupaj subsequently conceded removability and applied for asylum, withholding of removal, and relief under the Convention Against Torture ("CAT"). These requests were heard before Immigration Judge Miriam K. Mills ("IJ") on January 17, 2002. On that same day the IJ issued an oral opinion denying Jaupaj's requests for asylum, withholding of removal, and CAT relief. Jaupaj timely appealed to the Board of Immigration Appeals ("BIA"), which, in September 2003, summarily affirmed the decision of the IJ. Jaupaj now petitions us for review. We assert jurisdiction under 8 U.S.C. § 1252(b) and deny the petition.

Because the BIA affirmed the IJ's decision without discussion we review directly the IJ's decision. *See Secaida–Rosales v. INS*, 331 F.3d 297, 305 (2d Cir.2003). We review the IJ's determination of facts relevant to whether Jaupaj has established past persecution or an objectively well-founded fear of future persecution for substantial evidence, reversing "only if no reasonable fact-finder could have failed to find the past persecution or fear of future persecution necessary to sustain the petitioner's burden." *Diallo v. INS*, 232 F.3d 279, 287 (2d Cir.2000).

■ We have serious concerns with both the IJ's conduct of the hearing and the logic of her decision. IJs have broad discretion in the conduct of immigration hearings. While their decisional authority is somewhat more constrained by the demands of law and logic, the present practices of the Board of Immigration Appeals and our limited review of critical findings of fact, including determinations of credibility, place with IJs heavy responsibilities and concomitant power. These institutional and procedural realities amplify each other in obvious ways, but also confront parties with circumstances that present real dangers of eroding the adversarial process. This record presents us with just such a situation.

On the record before the IJ was an October 2001 letter from the Immigration and Naturalization Service addressed to Jaupaj's brother Selaudin Jaupaj ("Selaudin"). That letter notifies Selaudin that he has been granted asylum "pursuant to § 208(a) of the Immigration and Nationality Act." While the grounds upon which Selaudin was granted asylum are not part of the record before us, there is good reason to believe that they were identical or substantially similar to those articulated by Jaupaj in his asylum claim. Assuming that this was so, the disparity between the

resolutions of Selaudin's and Jaupaj's claims may implicate both the fundamental justice principle that like cases should be treated alike and also parallel rules requiring that the immigration agencies of the federal government follow, distinguish, or overrule their own precedents. *See, e.g., Johnson v. Ashcroft,* 286 F.3d 696, 700 (3d Cir.2002); *Davila–Bardales v. INS,* 27 F.3d 1, 5 (1st Cir.1994).

Despite the obvious, and potentially determinative, relevance of Selaudin's asylum status in Jaupaj's case, the particulars of Selaudin's asylum claim were not made part of the record at the IJ hearing. Frequently, the omission of critical evidence at immigration hearings is due solely to an applicant's failure to produce. That is not what occurred here, however. We know from the record that Selaudin was present and available to testify before the IJ at the hearing but that the IJ declared her disinclination to hear that evidence if Selaudin would only corroborate Jaupaj's testimony. That position appears to have been motivated by the IJ's fixation on other issues that obscured the obvious relevance, in light of Selaudin's status as an asylee, of Selaudin's corroborative testimony describing events and circumstances identical to those testified to by Jaupaj. While the cold record before us does not disclose the subtle and unsubtle dynamics of the situation, we have no reservation in stating that the IJ's actions in this regard deleteriously affected the record and, perhaps, compromised the ultimate outcome. She should have approached the process with a more open frame of mind, letting Jaupaj present the relevant evidence that he proffered, and reserving judgment until all of the evidence was in.

While we believe that the IJ's conduct of the hearing, in regard to Selaudin's testimony and his status as an asylee, would provide us with grounds to remand, we decline to do so, principally for two reasons, neither of which is sufficient to warrant forbearance independently. First, Jaupaj did not protest the IJ's disinclination to hear from Selaudin or press the relevance of Selaudin's asylee status. While we have some sympathy that Jaupaj might, for strategic or other reasons, have been reluctant to spark a confrontation with the IJ, the adversarial system does require courage and, at times, temerity. Second, at oral argument before us, the government agreed that, in these circumstances, there is no procedural bar preventing Jaupaj from moving to reopen his hearing in order to introduce relevant details of Selaudin's asylum claim.

■ The IJ's decision is also disappointing in itself. As we read the record, there are grounds for a sustainable opinion denying asylum. The IJ's attempt to put those pieces together in a decision was, however, inarticulate at best. Jaupaj's request for asylum relied on past persecution and fear of future persecution based on a pattern of incidents starting with the politically motivated murder of his grandfather and ending with the allegedly politically motivated attempt on the lives of Jaupaj and Selaudin. Jaupaj alleged that between these two events there was a pattern of persecution that included seizure of family lands, political detention of Jaupaj's uncle, three incidents of politically motivated detention of Jaupaj in the 1990's, one of which featured severe beatings administered by Albanian officials,[1] and the mur-

---

1. The record discloses that Albanian authorities may have had a legitimate legal basis for the 1991 arrest. The incident cannot be dismissed entirely from Jaupaj's asylum claim, however, given that Jaupaj and his brothers suffered politically motivated beatings during the 1991 detention and none of them appear to have actually been charged with a crime.

der of Gentian Jaupaj, another of Jaupaj's brothers.

The IJ credited all of Jaupaj's testimony save his claim that the most recent incidents of violence directed against him and his brothers were politically motivated. The IJ's doubts appear to have been inspired and sustained by the State Department's 2000 report on Albania. In reference to that report, the IJ found that "lack of reliable documentary proof to rebut the Asylum Profile regarding changed country conditions showing no nexus between the harm respondent and his family have *recently* suffered and their political opinion[s], defeats his claim of past persecution as well as well-founded fear" (emphasis added). This is fallacious, at least in part. Doubts as to the motivations underlying recent events do not defeat a claim of past persecution based on incidents prior to changes in country conditions. Also unavailing, because it is ambiguous and because it ignores incidents of violent detention in the 1990's when the Communist regime and its heirs were still in power, is the IJ's finding that the "persecution that [Jaupaj's] family suffered decades ago is far too remote to support a claim of asylum today."

Despite these deficits, we deny the petition on the present record. Based upon recent changes in country conditions described in the State Department Bureau of Democracy, Human Rights and Labor's May 2001 report titled "Albania: Profile of Asylum Claims and Country Conditions," the IJ was entitled to find that, while Jaupaj might well have suffered past persecution based on political opinion, and might have a subjective fear of future per-

secution based on political opinion, recent reforms in Albania make that fear objectively unreasonable. *See Secaida–Rosales,* 331 F.3d at 306. Jaupaj did not produce any evidence beyond his own testimony corroborating the objective reasonableness of his fear of future persecution based on political opinion. Given that this was so we cannot, on this record, "conclude that no reasonable factfinder could have failed to find that [Jaupaj] established . . . a well-founded fear of future persecution." *Chen v. INS,* 359 F.3d 121, 127 (2d Cir.2004). We *do not,* however, hold that a reasonable factfinder *could not have,* on this record, found that Jaupaj *does* have a reasonable fear of future persecution. To the contrary, as our discussion of Selaudin's status implies, this record does not compel a finding one way or the other.

We do not find, based on the record before us, that Jaupaj suffered past persecution that was so severe as to warrant grant of asylum on that ground alone. *See* 8 C.F.R. § 208.13(b)(1)(iii). While treatment suffered by Jaupaj and his family prior to post-Communist reforms in Albania, including the murder of Jaupaj's grandfather, the imprisonment of his uncle, and Juapaj's detention and beating in 1991, may well constitute "persecution;" it is not so "especially heinous" that it would be emotionally cruel to force Jaupaj to return to Albania. *See Bucur v. INS,* 109 F.3d 399, 404–05 (7th Cir.1997) (pointing out that asylum based on past persecution alone is reserved for persecution on par with "German Jews," "victims of the Chinese 'Cultural Revolution,'" and "survivors of the Cambodian genocide") (citation omitted).[2]

---

2. We note, and Jaupaj admits, that the post-Communist government in Albania has taken affirmative steps to provide some amends to Jaupaj and his family for the bad acts of its predecessor regime, including providing com-

pensation for stolen lands. While not relevant as a matter of logic to the severity of past persecution, these efforts surely salve concerns that Jaupaj's return to Albania would

Because Jaupaj has failed to fulfill the lighter burdens of 8 U.S.C. § 1101(a)(42)(A), it follows that he has failed to meet the requirements for withholding of removal under 8 U.S.C. § 1231(b)(3)(A). *Chen,* 359 F.3d at 127. It also follows that, having failed to show an objectively reasonable fear of future persecution, Jaupaj has failed to prove that "it is more likely than not that he . . . would be tortured if removed to [Albania]," 8 C.F.R. 208.16(c)(2), and, therefore, he is not eligible for CAT relief.

For the foregoing reasons the petition for review is DENIED.

constitute "cruelty." *See Bucur,* 109 F.3d at    404.